Home Life Insurance Company v. Fisher

642

*Taylor, Hurtt & Weisel*, for plaintiff.
*Wilner, Wilner & Kuhn*, for defendant.

ADAMS, J., May 21, 1954.—Plaintiff, Home Life Insurance Company, brings this bill in equity against defendant, Edwin H. Fisher, to cancel a policy of insurance issued on the life of Priscilla A. Fisher, deceased wife of defendant. The policy is of the face amount of $25,000 and contains an additional death benefit of similar amount in the event of death by accidental means. The bill alleges that the policy was secured by false and fraudulent representations made in certain answers in the application for the policy. The bill also seeks to restrain defendant from bringing an action at law upon the policy. Defendant in his answer denies that the policy was procured by fraud and pleads a counterclaim for the full proceeds of the policy. The two issues presented in the bill are:

1. Was the policy procured by false and fraudulent representations as to matters material to the risk?

2. Is a death which results from burns and shock sustained in an explosion of natural gas excludable from the accidental death benefits of an insurance policy which excepts risks resulting directly or indirectly, wholly or partly from "poison, drugs, medicine, sedatives, gas or vapor of any kind, including carbon monoxide?"

### Findings of Fact

1. Plaintiff, Home Life Insurance Company, is a corporation organized and existing under and in pursuance of the laws of the State of New York, and has its principal place of business in the City of New York, State of New York. Plaintiff is legally registered to do business in the State of Pennsylvania and has an office in the City of Pittsburgh, County of Allegheny, State of Pennsylvania.

2. Defendant, Edwin M. Fisher, is a resident of the City of Pittsburgh, County of Allegheny, State of Pennsylvania.

3. About January 1951 negotiations began between plaintiff and defendant relative to the purchase of insurance by defendant as a part of an estate conservation program. These negotiations, commenced at the instance of A. Robert Lawton, plaintiff's agent in the Pittsburgh office, extended over a year in point of time. In order to facilitate the issuance of the contemplated insurance, plaintiff's tax department prepared an extensive analysis of defendant's estate tax situation and on the basis of this analysis recommended the amount of insurance which would best satisfy the purpose of defendant. New wills were drawn for defendant and Priscilla A. Fisher, his wife, to conform to the estate conservation program being developed.

4. On March 3, 1952, Priscilla A. Fisher, as proposed insured, and defendant, as applicant, executed and delivered to plaintiff part I of a written application for special ownership insurance. Part I of the application provided, inter alia, as follows:

"The proposed insured hereby consents to the issuance of the insurance herein specified and hereby declares that the above statements and those he has made or shall make in Part II hereof are true and

complete and the applicant agrees that all such statements are the application."

5. On this same date Priscilla A. Fisher executed and delivered to plaintiff part II of a written application for special ownership insurance. This part of the application consisted of a medical questionnaire containing a series of questions concerning the health, habits and medical history of the proposed insured together with answers thereto handwritten by Dr. Fred A. Bissel, a medical examiner retained by plaintiff's Pittsburgh office. This part of the application authorized any attending physician to disclose to plaintiff any information respecting the health of the proposed insured and contained a certification that all answers given in the questionnaire were complete and true.

6. Included in the medical questionnaire were the following questions and the answers made thereto by the proposed insured:

Q "11 (a) Name and give address of every physician or practitioner whom you have consulted or by whom you have been treated or examined during the past five years. When and for what was each consultation or treatment made?

A. "2 pregnancies—Dr. Power, Magee Hospital 1948 and 1951, Normal Deliveries.

Q. "(b) Give name and address of your personal physicians.

A. "Dr. Power—Magee Hospital.

Q. "18(d) Have you ever had any diseases of the pelvic organs?

A. "No.

Q. "19. Give details of every disease, illness or operation and state number of attacks, duration, severity and exact dates.

A. "Denies any."

7. On or about March 13, 1952, A. Robert Lawton,

plaintiff's agent, obtained from the proposed insured her signature to an authorization directed to Dr. Howard A. Power. This authorization read as follows:

"It is my desire to furnish the Home Life Insurance Company with full details of all consultations, examinations and treatment you have given me in the past. My signature authorizes you to furnish the Company with all information required below, together with any records it may require."

No broader form of authorization is used by plaintiff.

8. A supplemental medical questionnaire prepared by plaintiff was attached to this authorization. In response to the authorization and at the request of A. Robert Lawton, the questionnaire was filled in by Dr. Walter E. Starz, an associate of Dr. Power and an attending physician of the proposed insured. The information contained in the questionnaire comprised the written modification of part II of the application for insurance as is more fully set forth in finding of fact 9.

9. On March 13, 1952, the proposed insured executed and delivered to plaintiff a written modification of part II of the application for insurance. Included therein was the following question and answer:

Q. "19. Give details of every disease, illness or operation and state number of attacks, duration, severity and exact dates.

A. "1-6-1948 pains during menstruation—cleared up, none since.

| | |
|---|---|
| 1–1948 | Basal Metabolism test—low at that time |
| 4–1949 | Basal Metabolism test—normal |
| 3–12–1952 | Basal Metabolism test—normal |
| 12–29–1948<br>1–27–1951 | Pregnant—normal deliveries |

Was also treated by Dr. Richards of Haverford, Pa. eight to ten years ago for low basal."

The written modification contained a statement that the information contained therein was complete and true.

10. A copy of parts I and II of the application for insurance, and a copy of the written modification of part II of the application for insurance, were attached to and constitute a part of the policy of insurance issued by plaintiff.

11. From about April 1948 until the time of her death, a fibroid tumor was present in the uterus of the proposed insured. This condition was known to her and to defendant at the time the application for insurance was made and at the time the policy was issued.

12. Fibroid tumors of the uterus, commonly called myomas, are of three types, i.e., submucous, subserous and intramural. These tumors are common to about 20 percent of women of child bearing age, and about one half of one percent of such tumors become malignant. Without surgery, these tumors never completely disappear. If they enlarge in size to that of a two or two and one half month's pregnancy, they may produce pressure effects on other parts of the body, or cause irregular bleeding or excessive bleeding during menstruation.

13. The particular fibroid tumor had by the proposed insured was of the subserous type. It was located in the right fundal or cornual area, i.e., at the top of the uterus and on its right side. During the pregnancies of the proposed insured, occurring in 1948 and 1951, the tumor enlarged to about five centimeters. Between pregnancies the tumor reduced to about one centimeter in size and at times was not capable of being felt. The tumor presented no symptoms and required no treatment.

14. The physical examination of the proposed insured by Dr. Bissel did not include an examination of the uterus.

15. A. Robert Lawton and Doctor Bissel had knowledge of the fibroid tumor. Defendant had imparted this information to A. Robert Lawton prior to the execution of the application for insurance, and the proposed insured had imparted the fact of the tumor to Doctor Bissel at the time she answered question 19 of part II of the application for insurance.

16. Neither the answers to questions 18(d) or 19 in part II of the application for insurance, nor the answer to question 19 in the written modification of part II of the application for insurance nor the answer to any other question on the application for insurance discloses the presence of a fibroid tumor in the uterus of the proposed insured.

17. A subserous fibroid tumor of the uterus is not a disease or illness.

18. In answering the questions contained in part II of the application for insurance and in executing the same, and in executing the written modification of part II of the application for insurance, the proposed insured acted in good faith and without the intent to deceive or defraud plaintiff. Defendant, as applicant, acted in good faith in applying for the policy and in executing part I of the application for insurance.

19. On March 19, 1952, plaintiff issued and delivered to defendant, life insurance policy no. 601,351, in the face amount of $25,000 and with an additional death benefit clause of similar amount in the event of death by accidental means. The policy insured the life of Priscilla A. Fisher and designated defendant as beneficiary. The policy was issued on the preferred risk plan which meant that defendant had to pay a lesser amount in premiums than he would have paid had the policy been one of ordinary life.

20. In issuing the policy, plaintiff relied on the answers found in part II of the application for insurance.

21. The initial and only premium paid on the policy by defendant was in the amount of $535.50.

22. The policy contained a provision that, in the absence of fraud, the statements contained therein were to be deemed representations and not warranties.

23. The additional death benefit provision of the policy provides as follows:

"The Company agrees to pay an additional amount equal to the face amount of this policy as an Additional Death Benefit, upon receipt at its Home Office in the City of New York of due proof that: . . .

"(b) said death resulted from bodily injury received after the effective date of this benefit and after the effective date of any reinstatement hereof, which injury was effected solely through external, violent and accidental means and is evidenced by a visible contusion or wound on the exterior of the body (except in the case of drowning or of external injuries revealed by an autopsy) and . . . Risks Not Assumed. The Company does not assume the risk and shall in no event incur any liability under this benefit if death, even by accidental means, shall result directly or indirectly, wholly or partly, from any of the following: . . .

"(3) Poison, drugs, medicine, sedatives, gas or vapor of any kind including carbon monoxide."

24. On December 11, 1952, Priscilla A. Fisher died as the result of burns and shock sustained in an explosion of natural gas in her home. The death was by accidental means.

25. On January 10, 1953, defendant gave notice and proof of death of the insured within the time and in the manner required by the terms of the policy.

## Discussion

Equity has jurisdiction to hear and determine this case. It is the law of Pennsylvania that a court of equity may cancel a policy of life insurance if the

policy was procured by the false and fraudulent representations of the insured: Equitable Life Assurance Society v. Klein et al., 315 Pa. 156; New York Life Insurance Company v. Brandwene et ux., 316 Pa. 218. It was also permissible for defendant to assert a counterclaim in his answer to the bill. Pa. R. C. P. 1510 for the action of equity authorizes the assertion of a counterclaim where the claim asserted arises, as it does here, from the same transaction or occurrence or series of transactions or occurrences.

Two questions are presented for determination by the pleadings. The first issue concerns alleged fraudulent representations to questions 18(d) and 19 in part II of the application for insurance and to question 19 in the written modification of part II of the application for insurance. Question 18(d) asks whether the applicant has ever had "any diseases of the pelvic organs." Question 19 requires the applicant to "give details of every disease, illness or operation and state number of attacks, duration, severity and exact dates." The answers to these questions do not disclose the presence of a fibroid tumor in the uterus of the insured. That the insured had a fibroid tumor and that both the insured and defendant knew of the tumor at the time the application for insurance was made was not disputed at the hearing. It is plaintiff's contention that true answers to these questions should have disclosed the presence of a fibroid tumor, that the failure on the part of the insured to so answer constituted misrepresentations which were material to the insurance risk and amounted to a fraud which would require the cancellation of the policy. The second issue arises because of defendant's assertion of a counterclaim. It requires the construction of certain provisions of the policy as to whether the manner in which the insured met her death was a risk assumed by plaintiff. This issue will be considered at a later point in the discussion.

The policy sought to be canceled contains the usual provision that, in the absence of fraud, the statements made by the applicant in the application for insurance are representations and not warranties. Since this provision is present, the burden is upon the plaintiff to prove: (1) That material representations made by the insured were false; (2) that the insured knew they were false when she made them or otherwise acted in bad faith in making them, and (3) that plaintiff relied in good faith upon those misrepresentations in issuing the policy: Evans v. Penn Mutual Life Insurance Company of Philadelphia, 322 Pa. 547; Travellers Insurance Company v. Heppenstall Company, 360 Pa. 433; Burton v. Pacific Mutual Life Insurance Company, 368 Pa. 613. Has plaintiff met this burden?

Obviously the answers to questions 18(d) and 19 in the application for insurance can be false in fact only if a fibroid tumor of the subserous type had by the insured is a "disease" or "illness" within the meaning of those terms as they appear in the insurance application. If a subserous fibroid tumor is not a disease or illness, the question in issue required no disclosure of the fact of the fibroid and consequently the answers made thereto by the insured could not be false in fact. In my opinion a subserous fibroid tumor is not a disease or illness for the reasons that: (1) The medical testimony, while contradictory, convinces me that a fibroid tumor of this type is not a disease or illness, and (2) a subserous fibroid tumor is not characterized as a disease or illness in the common speech of men.

Plaintiff's underwriting secretary testified that a subserous fibroid tumor is a disease and that by the use of the term "disease" in its insurance application the insurer desires any general abnormality of the body to be called to its attention. The testimony of plaintiff's associate medical director was much to the same effect. On the other hand there is much testimony

of an opposite character given by defendant's medical witnesses to the effect that a subserous fibroid tumor is not an illness or disease, is not so classified, is of no particular significance, and, when of the size had by the insured, requires no treatment. This testimony of defendant's medical witnesses, all of whom are specialists in obstetrics and gynecology, is the more precise and credible.

Doctor Power, defendant's witness, testified:

"Q. Would you have informed her (insured) that she had a disease of the uterus?

"A. No, it was not a disease. We don't classify it as a disease.

"Q. You do not classify a myoma of this type as a disease?

"A. Not at all."

The same witness testified:

"Q. If a patient has a fibroid tumor and it is usual that other fibroids develop, the other fibroids that develop could cause injury to the health in the future?

"A. Not injury to the health. A fibroid has no influence upon the health of the individual. The only thing a fibroid uterus requires if the conditions I have mentioned are present is operation, and the patient is completely cured."

Doctor Erving, called by defendant, testified:

"Q. Would you agree with Dr. Power in his statement that this is not a disease or abnormality of the uterus?

"A. You are getting into a technicality then, depending on your definition, the definition used. In our opinion we would not consider it a disease or an abnormality.

"Q. That is the opinion that is based upon your practice of obstetrics and gynecology?

"A. Obstetrics and gynecology.

"Q. Under more technical definitions of the term

'disease or abnormality' is it possible that this might be regarded as a disease or abnormality?

"A. Under a strict medical definition it might be, whereas under a definition such as you get in an ordinary dictionary where it implies it is a disease that affects a vital function, no.

This witness, on cross-examination by plaintiff's counsel, testified:

"Q. Do you consider a fibroid of the uterus an illness?

"A. I think it is rather a condition than an illness."

Dr. Starz, defendant's witness, testified:

"Q. Do you consider a fibroid of the size and in the location of Mrs. Fisher's to be an illness or a disease?

"A. No."

Dr. Carlin, a pathologist, called by defendant, testified:

"Q. Do you consider in your professional opinion a subserous fibroid located in the fundus of the uterus that has never been found to be greater in size than five centimeters to be a disease or illness?

"A. No, as I said before, we tend to emphasize to the patient that this isn't anything serious, it requires no treatment, that it causes no symptoms, and consequently, per se, is not a disease or an illness."

Moreover, in the final analysis the terms "illness" and "disease" as used in an application for insurance must be considered in the light of the insured's understanding of them in connection with which such terms are employed in the application. How then would the ordinary applicant for insurance consider these terms? In Silverstein v. Metropolitan Life Insurance Company, 254 N. Y. 81 (1930), the learned Judge Cardozo in holding a dormant duodenal ulcer not to be a disease or infirmity within the meaning of those terms in an insurance policy, stated at page 84:

"In a strict or literal sense, any departure from an

ideal or perfect norm of health is a disease or infirmity. Something more, however, must be shown to exclude the effects of accident from the coverage of the policy. The disease or infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men (Eastern Dist. Piece Dye Works v Travelers Ins. Co., 234 N. Y. 441, 453) 'Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract' (Bird v St. Paul F. & M. Ins. Co., 224 N. Y. 47, 51; Goldstein v Standard Acc. Ins. Co., 236 N. Y. 178, 183; Van Vechten v American Eagle Fire Ins. Co., 239 N. Y. 303). A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules.,

"A distinction, then, is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not a disease or infirmity, but at most a predisposing tendency (Leland v Order of U. C. Travelers, 233 Mass. 558, 564; Collins v Casualty Co., 224 Mass. 327; Mutual Life Ins. Co. v Dodge, 11 Fed. Rep. (2d) 486; cert. denied, 271 U. S. 667; Taylor v N. Y. Life Ins. Co., 176 Minn. 171, 174) . . .".

When a person thinks of "disease" he thinks of something of a settled character which impairs or will impair substantially his bodily processes and functions. While "illness" may connote conditions of bodily disorder or character less serious than disease, yet it too must be considered to refer to substantial disorders which may undermine the health of the individual. The record shows that the particular tumor of the in-

sured presented no symptoms, required no treatment, and was generally an insignificant condition. The record further indicates that a patient with such a condition would be told of this insignificance and not to worry about it. Under the circumstances then it may not reasonably be said that a subserous fibroid would be characterized as a disease or illness in the common speech of men.

Since the conclusion has been reached that a subserous tumor is not a disease or illness and that therefore the answers to questions 18(d) and 19 were not false answers, plaintiff, of course is not entitled to a cancellation of the policy. Let us assume, however, for the purpose of an adequate discussion of the controversy that such a tumor is a disease or illness and that the questions in issue required the disclosure of the fibroid by the insured. Under this assumption, there can be little, if any, doubt that the failure of the insured to disclose the fact of the tumor constituted misrepresentations of fact which were material to the risk assumed by plaintiff.

In determining the question of materiality to risk, the mature of fibroid tumors generally must be considered without reference to the particular fibroid condition of the insured which, as has been seen, was not particularly significant. It is also unimportant that the insured died from a cause wholly apart from the risk. Carson v. Metropolitan Life Insurance Company, 1 Pa. Superior Ct. 572.

The policy was issued on a preferred risk plan and at a consequent reduction in premium rates. For life underwriting purposes a preferred risk applicant must present higher probabilities of continued good health and life expectancy than the ordinary life applicant. According to plaintiff's underwriting secretary, a preferred risk policy is not issued by plaintiff to a woman with a fibroid tumor of the uterus. The reason for this practice on the part of plaintiff finds

justification in the medical testimony presented on both sides of the case. The medical witnesses were in general agreement that some 20 percent of women of child bearing age have uterine fibroids, and that a small percentage of these fibroids, about one-half of one percent, become malignant. Fibroid tumors may enlarge and produce pressure effects on other parts of the body, especially upon the kidneys. The testimony also reveals that the mortality rate of women with fibroids is higher than that of women without fibroids. Thus it would seem that the acceptance or rejection of the insurance risk, the rate of premium fixed, and the type of policy issued would depend upon the information regarding the tumor. Consequently, and assuming, as we have done, that a fibroid tumor of the uterus is a disease or illness, correct responses to questions 18(d) and 19 were vital to intelligent action by plaintiff in passing upon the insurance and the failure to disclose the fact of the tumor constituted misrepresentations of fact material to the insurance risk. Murphy v. Prudential Insurance Company of America, 205 Pa. 444.

Even under the assumption made above that a fibroid tumor of the subserous type is a disease or illness, and the consequent conclusion that the insurance application contained misrepresentations of fact material to the insurance risk, plaintiff still is not entitled to a cancellation of the policy. This is so because the good faith of the insured is amply disclosed by the evidence.

The falsity of an answer in fact and the good faith of the insured in making answer are distinct issues. An answer may be false in fact and yet not constitute fraud if the intent to deceive does not exist. The controlling element is the good faith of the insured. While it is, of course, true that every false answer in an application for insurance cannot be explained away by

the mere assertion of good faith, if the evidence establishes good faith, the answers cannot be false in law. This is the effect of our decisions.

In the instant case, the record is completely devoid of any evidence which would either permit or require a determination that the insured, or defendant for that matter, deliberately withheld any information from plaintiff or otherwise acted in bad faith in an attempt to procure the policy. All of the credible evidence requires a finding of good faith.

In the first place, the insured had been informed of the insignificance of the tumor by competent medical men. The insured had every right to rely on what they told her. Can it then reasonably be said that she would have any reason to believe that a condition regarded as unimportant or insignificant by her physicians would be regarded otherwise by plaintiff so as to require the deliberate withholding of information in an answer? I think not.

Secondly, the record discloses no motive for concealment on the part of either defendant or the insured. The policy was purchased as a part of an estate conservation program. It had as its purpose the conservation of estate and payment of inheritance taxes which would arise upon the death of defendant or the insured. The negotiations, which exceeded a year in point of time, were commenced, not at the instance of defendant or the insured, but rather by plaintiff's local agent. Defendant and the insured even had new wills drawn to conform to the insurance program developed for them. These circumstances, in themselves, mitigate against any idea of fraud, particularly where, as here, the whole purpose of the program for which the insurance was purchased would fail if fraud be perpetrated on plaintiff.

Moreover, shortly after the application was answered, the insured gave to plaintiff's local agent a

written authorization permitting him to obtain from her physician any information or records which might be necessary for completing a medical questionnaire which was attached to the authorization. The giving of this authorization exemplifies the good faith of the insured in dealing with plaintiff. That the physician in answering the questionnaire did not indicate the presence of the fibroid tumor cannot be laid at the doorstep of the insured. In point of fact, the physician did not mention the fact of the tumor because he did not think the questionnaire called for such information. The attempt of plaintiff to impugn the good faith of the insured by its assertion that the insured and her physicians conspired to keep the knowledge of the tumor from plaintiff is in no way supported by the evidence.

Certainly plaintiff may not complain that the authorization was not sufficiently broad to permit it to search all the available medical records on the insured. The authorization was prepared by plaintiff and it is in evidence that no broader form of authorization was used by it. The insured gave what plaintiff requested. The physician consulted by plaintiff's agent did not limit the extent of his investigation. The evidence does not disclose any lack of coöperation by the physician.

The fact that the insured signed the questionnaire as completed by her physician does not indicate bad faith. The omission of the information regarding her tumor in the answer to the questionnaire was entirely consistent with what she had been told previously about the insignificance of the tumor and consequently no doubt should have been raised in her mind as to the accuracy of the completed questionnaire. Finally there is the testimony of defendant that he mentioned the fibroid tumor of the insured to plaintiff's local agent prior to the execution of the application and also that the insured in answering question 19 on

part II. of the application for insurance told plaintiff's medical examiner that she had a fibroid tumor. Although this testimony was denied by the agent and the medical examiner, I am of the opinion that defendant's testimony is the more precise and is entirely credible.

The conclusion thus reached that plaintiff is not entitled to a cancellation of the policy accords with the clear and unmistakable trend, as indicated by the footnote in the Evans case (at page 552) toward broadening the right of recovery in insurance cases of this type where the good faith of the insured is sufficiently disclosed.

Passing to the second aspect of the case, the question arises as to whether the death of insured from burns and shock resulting from an explosion of gas was a risk assumed by plaintiff so as to permit defendant to recover the accidental death benefits of the policy. So far as relevant the double indemnity provision of the policy and the exclusionary clause therein provides as follows:

"The company agrees to pay an additional amount equal to the face amount of the policy as an Additional Death Benefit, upon receipt at its Home office in the City of New York of due proof that: . . .

(b) said death resulted from bodily injury received after the effective date of the benefit or after the effective date of any reinstatement thereof, which injury was effected solely through external, violent and accidental means and is evidenced by a visible contusion or wound on the exterior of the body (except in the case of drowning or of internal injuries revealed by an autopsy). . . .

Risks Not Assumed. The Company does not assume the risk and shall in no event incur any liability under this benefit, if death, even by accidental means, shall result *directly or indirectly*, wholly or partly,

from any of the following: (c) Poison, drugs, medicine, sedatives, *gas or vapor of any kind, including carbon monoxide.*" (Italics supplied.)

That the death of insured resulted from accidental means is not disputed. It was caused by an explosion of gas. We need not consider whether the cause was proximate or remote. The questions are: Does the exclusionary clause embrace death caused by gas explosion? Or does it bar recovery only where death results from asphyxiation?

The exclusionary clause as used in the policy as to death from gas is ambiguous. The word "gas" as it appears in subsection (3) of the exclusionary clause is sufficiently broad, if taken in its literal sense, to include death from gas explosion. However, it is equally true that the clause in question specifies death from such other lethal agencies as "poison, drugs, medicine and sedatives." It will be observed that death caused by gas asphyxiation is like the death caused by these other lethal agencies set forth in the clause in at least the following particulars: (a) such death results from a caustic or toxic reaction of the human body to foreign matters consumed or inhaled by the body; (b) like the other agencies listed it is a common murder or suicide device, and (c) like these other agencies it does not cause death by physical impact, concussion or similar forms of violence. Conversely, death from gas explosion does not result from a caustic or toxic reaction of the body to matters consumed or inhaled; it is not a common murder or suicide device; and it is a death from physical impact or concussion. Thus, this clause affords of two constructions, the one that gas explosion is covered by its terms, and the other that only death from gas asphyxiation was intended to be excepted from the risk.

Where doubt exists as to the meaning of language employed in an insurance policy it should be resolved

in favor of the insured: Levinton et al. v. Ohio Farmers Insurance Co., 267 Pa. 448. This principle has been cited frequently by our appellate courts, a recent reiteration being found in Harding v. Pennsylvania Mutual Life Insurance Company, 171 Pa. Superior Ct. 236, affd. 373 Pa. 270. In holding that the term "war" as used in a double indemnity exclusionary clause meant declared war and not declared or undeclared war, the late Judge Dithrich said at page 251:

"The attempt of the appellee to evade liability of double indemnity should not receive judicial condonation. The phraseology of the policy was chosen by the insurer and tendered in fixed form to the prospective policyholders and since its language is reasonably open to two constructions, we will adopt that construction which is more favorable to the insured."

As is indicated by the above cited cases no injustice is done to the insurer by this strict rule of construction. The insurer is the writer of the policy; it is a simple matter to include therein that which it wishes to be excepted. When it has attempted to do so and thereby used language subject to two constructions it cannot complain if the construction favorable to the insured is adopted. Defendant therefore is entitled to recover the accidental death benefit. The exclusionary clause applied to death from gas asphyxiation but not to death from gas explosion.

### Conclusions of Law

1. Equity has jurisdiction over the parties and the subject matter, and under Pa. R. C. P. 1510 of the counterclaim pleaded by defendant.

2. A subserous fibroid tumor is not a disease or illness.

3. The answers to questions 18 (d) and 19 in part II of the application for insurance and the answer to question 19 in the written modification of part II

of the application for insurance were not false answers.

4. The presence of a fibroid tumor in the uterus of an applicant for insurance is a matter material to the risk assumed by an insurer.

5. Defendant in applying for the policy of insurance and in executing part I of the application for insurance acted in complete good faith, and without the intent to deceive or to defraud plaintiff.

6. The insured in executing part II of the application for insurance and in executing the written modification of part II of the application for insurance acted in complete good faith, and without the intent to deceive or defraud plaintiff.

7. The policy of insurance issued by plaintiff to defendant was not procured by fraud, misrepresentation or concealment of any material fact.

8. The policy of insurance issued by plaintiff to defendant is a valid and subsisting contract, and plaintiff is not entitled to its cancellation.

9. A death which resulted from burns and shock sustained in an explosion of natural gas is not excludable from the accidental death benefits of the policy which excepts risks resulting directly or indirectly, wholly or partly from "poisons, drugs, medicine, sedatives, gas or vapor of any kind, including carbon monoxide."

10. Plaintiff is indebted to defendant under the terms of the policy in the sum of $50,000, with interest at the rate of six percent per annum from January 10, 1953.

### Decree Nisi

And now, May 21, 1954, it is ordered, adjudged and decreed:

1. Plaintiff shall pay to defendant the sum of $50,000, with interest at the rate of six percent per annum from January 10, 1953, and

2. Plaintiff shall pay the costs of this proceeding.